[981 NYS2d 17]

In the Matter of ANONYMOUS, for Admission as an Attorney and Counselor-at-Law.

First Department, February 18, 2014

**APPEARANCES OF COUNSEL**

*Committee on Character and Fitness for the First Judicial Department* (*Maria M. Matos*, Executive Secretary).

*Trevor L.F. Headley*, for petitioner.

## OPINION OF THE COURT

Tom, J.P.

This is the applicant's third attempt to seek admission to the New York State bar. Prior to his academic studies, the applicant amassed an extensive criminal record including a charge of second degree felony murder as a result of a suffocation death of an elderly female victim during a home invasion robbery committed by applicant and his then partner in crime, when applicant was almost 30 years old.

In 1985, the applicant submitted his application for admission. After a lengthy proceeding before the Committee on Character and Fitness, petitioner withdrew his application in 1989. In June 1990, the applicant moved to renew and to transfer his application to the Second Department. This Court granted his motion to renew but denied the transfer request. In November 1993, a subcommittee of the Committee concluded that the applicant had failed to establish the requisite character and fitness to be admitted. In January 1994, the full Committee adopted the subcommittee's 33-page report and voted to deny petitioner's application. In December 2008, the applicant again moved for leave to renew this application for admission, which motion was granted to the extent of referring the matter to the Committee for "investigation, hearing and recommendation." A hearing was held before a subcommittee which issued a report recommending petitioner's admission. The full Committee, by a majority vote, recommended denying admission. The applicant presently moves this Court for admission notwithstanding the Committee's denial of his application.

The applicant's criminal record dating back to the 1970s shows someone who gravitated to society's underside before escalating to crimes that culminated in the brutal death of an elderly woman. Although this criminal history, now several decades old, would not itself be a dispositive consideration as we evaluate the present application, it nevertheless provides something of a template for our analysis of his character and moral fitness. A renewal applicant does not get to wipe the slate clean, so to speak, simply by the passage of time for purposes of our subsequent review. Regardless whether the crime was committed recently or years ago, the applicant was required to adequately address his criminal past.

In order to evaluate his present character for these purposes, it is important to look into why his initial application for admis-

sion to the bar was unsuccessful, and to use the record of that proceeding, which necessarily incorporated his criminal record, as a baseline for measuring his rehabilitation as well as his credibility and acknowledgment of responsibility with respect to the current application.

The applicant's possession of a stash of bottles of counterfeit perfume resulted in his 1973 arrest for forgery in the third degree and criminal simulation, even though the charges were later dismissed. Also in 1973, and through 1975, he managed two New York massage parlors and a Rhode Island massage parlor which law enforcement sources identified as centers for organized crime. In 1975, he was arrested for at least four New York cocaine sales on different occasions during the prior year in the vicinity of 34th Street and First Avenue totaling over $21,000—substantial revenues, especially in 1975 dollars. These arrests, and his ongoing explanations for them, are relevant to our evaluation of the applicant's fitness for the bar, as is discussed below. He was released when he agreed to act as a confidential informant, and he was registered as such with the New York City Police Department. In that capacity he reportedly provided information about organized crime operators, cocaine sales and other narcotics trafficking. His cooperation led to the arrest of a single suspect.

After the 1975 burglary-homicide that is also discussed below, the applicant, no longer a confidential informant and, therefore, no longer a beneficiary of that status, pleaded guilty under two indictments to several counts of criminal sale of a controlled substance in the second degree in connection with the 1974 and 1975 drug sales. He was sentenced to concurrent terms of $8^1/_3$ years to life, although he initially protested that he did not "feel guilty of selling drugs." The applicant's continuing attempt to minimize his culpability in connection with his drug sales, as discussed below, factors into our rejection of the present application.

In November 1975, the applicant was arrested again, now charged with grand larceny in connection with his unauthorized use of a motor vehicle, criminal possession of stolen goods and possession of burglar's tools; as is also noted below, the applicant continued to claim that he was innocent and was unaware that his companion was committing a crime.

On December 12, 1975, 38 years ago, the applicant and a co-defendant were arrested for murdering a 69-year-old woman whose apartment they burglarized. This arrest and the ap-

plicant's subsequent conviction will be further described below insofar as the applicant's explanation of his participation has a continuing bearing on our decision to reject his application. After separate trials, the codefendant was convicted of murder in the second degree and sentenced to 15 years to life, although his conviction was later reversed by the Court of Appeals on the basis that his statement had been unlawfully obtained. The codefendant pleaded guilty to robbery in the first degree and thereby avoided a retrial. Faced with a murder charge and his own inculpatory statement as to which suppression had been denied, the applicant pleaded guilty to burglary in the first degree and was sentenced to a maximum term of 20 years. The Second Department affirmed the judgment. He served five years of the sentence and was released to parole supervision in 1980, and received a final discharge from parole in 1986.

From that point, the applicant's personal history took a commendable turn for the better. Making beneficial use of his time after his release, he attended law school and received a J.D. degree in 1985. After passing the bar examination, however, his 1985 application for admission was rejected in substantial part because of his lack of candor and veracity in acknowledging his criminal past, especially about his drug sales and his actions during the burglary that led to the victim's death.

The Committee on Character and Fitness at the time found no support in the record for what the applicant characterized as mitigating circumstances. Our review takes into account those earlier explanations as a baseline, and his more recent explanations as we evaluate his present character. As already noted, we continue to take into account the applicant's rehabilitative endeavors since his release from incarceration.

In our review of this application for admission to the bar of the State of New York, we are focusing, in the main, on four factors: the nature and extent of the applicant's criminal history and, in this case, its tragic consequences; whether the record before us creates a concern that he will re-offend; the nature and extent of his rehabilitation; and, relatedly, whether he has manifested adequate candor in explaining the criminal episodes of his past and how his candor or the absence thereof sheds light on his moral fitness to practice law as that criterion has been employed for admission to the bar. Section 90 of the Judiciary Law governs our review of these issues, and requires us to evaluate an applicant's character and general fitness with respect to the responsibilities burdening an attorney licensed to

practice law in New York. Notably, each application must be considered on its own merits.

We focus our review on the merits of the applicant's request for admission. The applicant's first attempt to be admitted to the bar foundered on written information provided with the 1985 application form and the testimony in which he tried to fill in unsatisfactory gaps or to justify aspects of his criminal record. The applicant, answering the inquiry in the application whether he had ever been arrested, claimed that he was arrested for *a drug sale*—singular, not plural—in March 1975 and that was actually only a "favor" for a friend. It was the applicant's misfortune that the "friend" was actually a police informant. The applicant was arrested again shortly thereafter for the 1975 burglary-murder. The applicant explained in his application that the latter arrest occurred while he was "assisting in an investigation of a target," impliedly his codefendant to the burglary-homicide, and by implication distancing himself from culpability. The applicant blandly related in his application that "the circumstances of this arrest were mitigating," which purportedly allowed him to plead guilty to burglary after two years of detention. As for rehabilitation, he claimed that after his 1980 release, he "lived by my revised and corrected standards, both morally and in accord with what society expects of me," and was happily married with stepchildren. Elsewhere, he responded in the negative to inquiries in the application whether he had ever been charged with fraudulent conduct or any other act involving moral turpitude, or was a party to any civil or criminal action.

That earlier admissions committee also reviewed the applicant's written claim that he had essentially been forced into acting as a confidential informant, and that he had been acting in such an investigative capacity targeting a "former employer" who owned a "moving business" when he was arrested on a charge which he did not specify but, in context, seems to have been the burglary-homicide charge. The applicant claimed that he had been acting on unspecified instructions from the police department when he was involved with the target on the night of that event, and thought that he was simply helping the mover move furniture and that he only waited in the car while his companion entered a house. He claimed—although complained would be a more apt description—that he was "left to face the entire matter alone" when his confidential informant status was rescinded, and thereafter "[p]ressure was brought to bear

for me to accept a bargained plea." This left out many details, which then became the focus of hearing inquiries.

The applicant submitted an affidavit to supplement his statements in the above-noted application, wherein he related that upon entering the house, they went upstairs and found an elderly woman asleep. When she woke up *"we* bound her with bedsheets" (emphasis added). Notably employing the passive voice when describing how she was treated, the applicant averred that "[a] gag was placed around her mouth. The house was searched and a number of handbags were taken." The woman died, as determined by the medical examiner, from asphyxiation caused by the gag. Nevertheless, the applicant averred that *"[b]efore leaving the house* I made an excuse and returned upstairs where the woman was. I checked her . . . and untied the bonds and removed the gag from her mouth. When I left I was reasonably sure the woman was okay" (emphasis added).

A subcommittee hearing was conducted on December 8, 1986. The Committee asked the applicant about his March 1975 arrest for a drug sale and whether it was the first time he was arrested. Responding—incorrectly—that it "was the first time per say [sic]," he alluded to other people who "used to run . . . a variety store" and there was an incident where "the entire group" was "taken down to the police department" for "questioning" because "it was discovered" that perfume being sold was "bogus," but that they directed police to where they had purchased it and while he "believe[d] it did result in an arrest or products being confiscated," there was no hearing or court appearances, he was released, he believed that no "record" of the incident was kept, and his memory otherwise was vague.

No initial reference was made to the other drug charges. Later in the hearing when he was asked about the other three charged sales, he explained that the sales were to the same people, although on different occasions, so that he "sort of lumped them all together since it all flowed from that initial incident." The sales were to undercover officers who were brought to the applicant by a police informant, whom the applicant knew through his business. The applicant, implying an agency defense, testified that he had never seen nor sold drugs before in his life, that he asked around for sources, whom he would not have known because he was unfamiliar with drugs, and that he was only accommodating his acquaintance's requests.

The applicant was also arrested in November 1975 for participating in the theft of a hijacked truck and its contents. The applicant tried to pass this off as a misunderstanding on his part, in that he drove a truck for the codefendant, the aforementioned "target" of the investigation into drug sales and other criminal activity and the same person with whom the applicant participated in the burglary-homicide. The applicant explained that the codefendant owned a used furniture store across the street from where he lived, that police had told him to get friendly with the codefendant and to report on his activities, including drug trafficking, and that for that reason he took a job in the store. The applicant claimed that on the evening he was arrested for unauthorized use of a motor vehicle, he thought they were picking up used furniture to be transported elsewhere, but that his companion actually hijacked a truck. The applicant claimed that, in fact, he alerted law enforcement to the hijacking. The claim was not substantiated and, in fact, seemed to be undermined by later testimony.

That companion, the codefendant, also played a prominent role in the crime around which the applicant's future pivoted, the tragic December 5, 1975 burglary-murder of the older woman. The applicant recounted that he had been asked by his codefendant to drive with him to a house where the codefendant commonly stored furniture. Instead, they entered the house next door. The applicant testified that he initially waited in the car while the codefendant entered, then exited and asked for his help. They went upstairs, where the applicant saw the woman, who had been asleep. He explained that by now there was no way that he could safely back out without arousing his codefendant's suspicions and jeopardizing the investigation. He also denied having ever been advised by his police department contacts that his informant status did not allow him to commit a crime (this was contradicted by later police testimony). He admitted that they both bound and gagged the woman. When the codefendant entered another room, the applicant claimed he removed the gag from the woman's mouth out of a concern that she might swallow it. The codefendant, having taken bags, furs and jewelry, then left with the applicant. The Committee noted that court records reflected that the jewelry was valued at $80,000 (this was in 1975 dollars, which suggests a very sizeable heist).

The applicant testified they went to his own apartment to examine the stolen items. The codefendant took the jewelry, but

left the furs with the applicant. The applicant admitted that he did not try to communicate with his police contacts at that time, but when the codefendant allegedly indicated the following day that he intended to return to the house to kill the woman, the applicant claimed he reached his police contacts, described the burglary and provided the address. The Committee, obviously doubtful of this chronology, pointed out that the applicant was arrested on December 12th, after the victim's body was found on December 11th by police surveillance, yet the applicant claimed to have informed police five days before on December 6th. Of course, in the applicant's account, the woman was alive when he left. However, he also testified that in the intervening six days, the codefendant mentioned to him that police had already found the woman's body. The applicant and the codefendant were identified as the perpetrators by the next door neighbor who seemed to know the codefendant and the applicant, which further undermined the claim that he reached out to police the following day. The stolen furs, which he apparently neglected to mention during his putative next-day phone call, were recovered from his apartment, another link in the chain of culpability that destroyed the applicant's characterization of his role as purely investigative.

When asked whether he ever returned to the house after he and the codefendant had initially left, he answered no. He assumed that the codefendant did, however, because the applicant had taken the gag out of the woman's mouth in order to avoid further harm to her, and the autopsy report reflected that the gag had asphyxiated her, from which he concluded that the codefendant must have slipped back upstairs and replaced the gag without alerting the applicant.

When presented with his statement made in connection with his law school application wherein the applicant recounted that he had waited in the car when the codefendant entered the house, and later was informed that it was not the intended house—thereby removing himself from the scene of the homicide—the applicant admitted that it was an inaccurate statement. He also admitted that his response in his written application for admission to the bar, wherein he claimed that he was assisting an investigation when he was arrested with the target and charged with homicide, was "not correct per say [sic]." He claimed, however, in what must be characterized as contorted logic, that but for the directives he received from police as a confidential informant—coercion was how he characterized

those directives in his application—he would not have been in contact with the codefendant, and would not have ended up in "the situation" where he found himself. Detracting somewhat from his narrative of surprised innocence, the applicant conceded that after the codefendant fenced the jewelry, the applicant was paid about $2,100. The applicant now abandoned the unelaborated and ultimately implausible earlier statement in the application that the circumstances of his arrest were mitigated by his prior cooperation with police.

During a later phase of the subcommittee hearing in 1989, the Dean of the applicant's law school provided character testimony, although its value eroded under questioning addressed to the witness's personal knowledge of the character evidence. The Dean, who conceded the lack of his personal involvement in the admissions inquiry, apparently had only a partial file, with several items missing that would have been relevant to the law school application and admissions interviews. The law school admissions personnel who had interviewed the applicant had not taken notes and did not recall his responses to inquiries. The Dean acknowledged that the admissions process for a candidate with a criminal record relies essentially on the law school applicant's good faith and that he would not necessarily have been informed by admissions personnel about specific negative information. The Dean conceded that he was informed of the applicant's pre-burglary arrests only just before the hearing. He also conceded that he had not talked to the applicant about the homicide, had not inquired into the event, nor knew about the victim, whom the Dean initially thought might have been a policeman. Although the Dean characterized his confidence in the applicant as "unshakeable," that was based exclusively on law school observations. He declined to relate his opinion of the applicant's character to events preceding law school, but found it to be "meaningful" that the applicant had "served his time."

As character evidence, this was less than persuasive. In subsequent questioning addressed to the omissions on his law school application on which the Dean relied, the applicant claimed that he had forgotten about some arrests and, not knowing what the school was interested in, had disclosed only the most serious charge, the burglary-homicide.

A Supreme Court Justice, for whom the applicant interned for a short time, spoke well of him, recalled that others in the court system also did, and testified that the applicant had been

forthcoming in a general way about his burglary conviction and the fact that the victim had been asphyxiated. The Justice indicated that he had not pressed the applicant for more details, and more were not offered, although he surmised that the applicant would have been forthcoming had he been probed for additional details.

The applicant's wife also provided character evidence which was affectionate and supportive, and described a responsible, mature, diligent and hard working husband and father. Notably, she testified that he had explained to her that *after he and* the codefendant *left the burglarized home,* he *left the car and returned to the woman* to remove her gag. This attempted mitigation of culpability was tellingly inconsistent with the chronology otherwise provided by the applicant, wherein he claimed to have returned to the room and removed the gag before leaving the house.

During a May 23, 1989 appearance, the applicant conceded several of the omissions in his application that had been raised by the subcommittee. He also conceded misstatements where he tried to minimize or evade personal responsibility for prior criminal activities. He explained that his evasions and misstatements were the result of shame and embarrassment. He characterized his prior demeanor before the subcommittee as defensive, in that he had difficulty accepting responsibility, but that with proper counsel, he now understood the need to concede his evasions and misstatements and to acknowledge his responsibility. He also recounted his path, while in prison, towards responsibility and achievement in a constructive life, how he received sufficient credits to be awarded a college degree and then how he became committed to a career in the law. He testified about his marriage, and what must be seen as a remarkably diligent work life, often employed full time in two jobs at once. These latter attributes are undisputed and they reflect very credibly on his development of an admirable character as a husband and a father. However, the applicant's serious criminal history and how he dealt with that past were relevant considerations for the subcommittee with respect to his character relating to his admission to the bar.

The applicant's credibility, though, was to deteriorate even further when police officers who were familiar with applicant's criminal activities testified. On that same hearing date in 1989, testimony was received from Lieutenant B. and Lieutenant D., to whom the applicant had been assigned as a confidential

informant in 1975 when he was arrested for cocaine sales and agreed to cooperate. Lieutenant B. explained the origin, structure and operational protocols of the unit to which the applicant was registered, the Organized Crime Control Bureau, which was responsible for investigating traditional organized crime as well as higher level narcotics trafficking. Lieutenant B. was the commanding officer of the unit and was present for the arrest; Lieutenant D. acted as the undercover officer for the purchases of narcotics from the applicant. The officers testified that their attention turned to the applicant when he became involved in significant cocaine sales involving several thousand dollars. When he was arrested, he was in possession of eight ounces of cocaine, which Lieutenant B. characterized as a "large buy."

The registration documentation for the applicant reflected that he informed the officers that he was knowledgeable about narcotics, stolen goods and hijacking and could provide information in those areas. This information was important insofar as the officers had to determine whether it was worth it to register an arrestee as a confidential informant. It was also at variance with the applicant's tendency to minimize his culpability. Lieutenant B. testified that subsequent questioning would determine whether the arrestee, indeed, was knowledgeable in the areas where he claimed expertise. The applicant, subjected to such questioning, apparently passed the test. Lieutenant B. also testified that the unit would use a confidential informant only to go higher up the chain of a drug organization, and not just to lead to the arrest of street dealers, which suggests that the applicant's acceptance into the program relied on something other than his claim of being a hapless, innocent participant. The large quantities of cocaine which the applicant was able to acquire and sell qualified him for registration as a confidential informant.

The police witnesses gave testimony, about which they were rigorously cross-examined by the applicant's attorneys, that in many respects sharply contradicted that of the applicant. Whereas the applicant testified that police directed him to familiarize himself with his later codefendant, Lieutenant B. testified that it was the applicant who brought the codefendant's activities to their attention upon being registered as a confidential informant. Lieutenant B. testified that every informant, upon being registered, was specifically directed not to commit a crime, but to bring information about a crime be-

ing committed in his or her presence to the attention of his police contact as soon as possible; this contrasted sharply with the applicant's claim that he was not warned not to participate in crimes. Lieutenant B. also testified that when a confidential informant called in or otherwise communicated such information, it would also be reported immediately to him, as commanding officer of the unit. No such information about the burglary-murder was provided to Lieutenant B., and there was no documentation that the applicant had called any police contact.

A recess was taken while transcripts of conversations with the applicant recorded during or in connection with the drug buys were copied for distribution to his attorneys. The purpose of the transcripts seemingly was to rebut some of the applicant's explanation that he was only facilitating a sale at the urging of a police informant. However, a record was never developed as to the transcripts since the applicant withdrew his application for admission shortly thereafter.

The applicant applied for renewal in 1990, and additional materials were submitted. The details of the re-application need not be summarized, except to note that documentation, again, was missing and the endeavor was unsuccessful.

In its findings, the 1993 subcommittee remarked on the applicant's manifest evasiveness. It characterized his information and responses as incomplete, inaccurate and misleading. The subcommittee, on the basis of its review of the substantial documentation summarized above, also found no connection between the crime and the applicant's activities as a confidential informant. The subcommittee noted that there was positive character evidence, commented favorably on the applicant's progress towards becoming a productive member of society, and described him as "gifted with extremely high intelligence, charm and guile." However, the subcommittee found that he had not yet overcome his tendency to dissemble, noted his failure to acknowledge and disclose the entire truth, even when under oath, as well as his refusal to accept personal responsibility for his admitted misconduct, and his propensity to blame others for his own misdeeds. The subcommittee noted that he modified his statements not to be truthful, but only to conform to information as it became available to the Committee. The record amply supports those findings at that time.

Turning to the present renewed applicat
recent record, two decades later, a pr

directed to whether the applicant can offer credible evidence in support of his character, and in that regard his candor, beyond that already in the record.

We find that some of the same traits bearing on the character of the applicant that were brought out in the record for the original application still manifest themselves, even if they seem less pronounced. The applicant verbally takes responsibility in a formal sense, but he clings to some explanations concerning the crimes he committed that continue to seem implausible. Moreover, and without detracting from the applicant's post-incarceration unblemished record, we find the outcome in *Matter of Wiesner* (94 AD3d 167 [1st Dept 2012]), on which the dissent relies, to provide a false comparison.

As already stated, each case must be decided on its own merits; the particular nature and extent of Wiesner's post-incarceration record of rehabilitation was a significant factor in the outcome. Nor was the victim in that case killed. In any event, while the dissent seems intent on revisiting the *Wiesner* case, we are directing our focus to the present application, which must be decided on its own facts. Admission to the bar does not become an entitlement simply because someone else with a criminal history, on the facts of that prior case, was granted admission. Our inquiry is not directed to whether the applicant has just been living a commendable life for an extended period of time, which the dissent seems to suggest, but, rather, whether his post-conviction life has been so exemplary as to make amends for his crimes. The more severe the crime the higher the bar. We find the killing of a 69-year-old female during the commission of a robbery in her home to be an egregious crime. While we do not condone the crimes committed by Wiesner, which were also serious, there was no human life taken during his crime spree. In notable contrast to this case, in *Wiesner*, the applicant's extraordinary efforts, attested to by numerous character witnesses well positioned to evaluate those achievements—achievements that also persuaded six other jurisdictions, including the United States Court of Appeals for the Second Circuit, to admit him to the practice of law years earlier—finally persuaded this Court that he satisfied that heavy burden. Merely living a responsible life is a necessary condition, but not a sufficient one, and it was inadequate for Wiesner until his tenth and final successful application.

After the applicant was recently granted leave to renew his application again, a hearing was conducted on May 19, 2011

and June 7, 2011. The applicant explained his evasiveness at the time of his first application in terms that he had not "forgiven myself for what I had done," and was "not ready," but that he could now "sit before you and say yes, I did those things and yes, they were totally egregious and I don't know who that person was . . . and I'm not that person now." The applicant testified that his last criminal activity was at the age of 29 years and that he was 64 years old at the time of the present hearing, a passage of 35 years. He now testified that he took responsibility for his actions, he had not been totally forthcoming in his prior application, and he acknowledged that there was no one to blame but himself. Notwithstanding this general acknowledgment, however, the applicant still tended to equivocate when it came to specific culpable details of his crimes, thus, placing in doubt the sincerity of his acknowledgment and atonement of prior crimes.

The newly composed subcommittee noted that the applicant was relying on application materials that had been examined in the prior proceeding, and that notwithstanding a commendable redirection in his life prior to that time, his application foundered on a "complete lack of candor in your prior applications." The applicant now admitted that he knowingly participated in the burglary, but still maintained that he had returned to the woman's room and removed the gag from her mouth, notwithstanding the subcommittee's present observation that the explanation seemed inconsistent with the medical evidence. The applicant now recalled that he removed the gag before he and his codefendant went down the stairs, and he now recalled that the codefendant went back upstairs, but "what happened then, I don't know." However, it follows from this explanation that the codefendant, having exited the house, returned with no apparent reason and with no explanation to the applicant to a house they had just committed a robbery, when it would have made more sense to quickly escape with the stolen goods. Again, if in a different manner, the adjusted explanation seems to strain plausibility. With respect to the truck hijacking, the applicant testified that he had been asleep when the codefendant asked him to drive codefendant's truck to a particular location, and, once there, "we were unloading stuff out of the truck into his truck. I was told that the truck had broke[n] down." At the time, the applicant testified, he had not known the other truck had been stolen. For a self-professed specialist in hijacked trucks—or so he had described himself to his police contacts—this seems to have been an implausible explanation.

With respect to the drug sales, the subcommittee recounted that the applicant had initially testified that he had only been accommodating someone by trying to find cocaine for him, and that he had claimed to be unfamiliar with drugs, whereas police evidence established that the applicant was engaged in major drug deals, and that the sale of kilos of cocaine had been discussed by the applicant in recorded conversations. Again, a marked pattern of evasiveness arises which became manifest during the applicant's less than coherent admission during this phase of testimony. The applicant responded that he had no idea where the reference to kilos came from, but "there was a substantial amount of drugs," which, in legal terms, is hardly a frank admission that he was prepared to sell or indeed sold a substantial amount of cocaine.

At the June 7, 2011 hearing, one of the Supreme Court Justice's who had testified did so again. An attorney of some prominence also testified as a character witness. While each of these two character witnesses are highly regarded, their testimony cumulatively, although formally supportive, did not portray the extraordinary achievements that we would look for in a case such as this. The since retired Justice explained his support of the applicant who had been in trouble and turned his life around and who could serve as a role model to others who, also, were convicted and incarcerated—that they, too, upon serving their time, could turn their lives around and rejoin society in a constructive role. While we certainly value this point, merely being used as a role model does not pass the bar, so to speak, when an elderly victim was killed. The Justice testified that other lawyers with whom he had dealings respected the applicant's reputation for honesty. Again, this should be a minimal condition, but not itself sufficient. However, this Justice, as with the other Supreme Court Justice and the Dean in connection with the original application to the bar, seemed only marginally familiar with the applicant's criminal record which necessarily detracts from the value of this character evidence. This Justice thought that the applicant was arrested for a drug raid, and assumed that it was major trafficking since an undercover officer was involved—but when reminded about the burglary, he only vaguely recalled that a victim had been asphyxiated. When informed that the original application had been rejected because the subcommittee found that the applicant's explanations lacked credibility, the Justice stated that it is a common reaction for criminal defendants to minimize

their culpability in their own minds and to explain themselves accordingly. As character evidence, this testimony was not compelling.

The attorney who offered character evidence testified that he had known many of the attorneys for whom the applicant had worked as a paralegal and that they spoke well of him. Of course, character evidence by those other attorneys might have been more helpful. The subcommittee apprised the witness that the earlier subcommittee had been concerned not so much with the applicant's criminal record, but with the applicant's "absolute lack of candor which . . . you know is one of the most troubling things we ever deal with in our applications." The subcommittee noted that the applicant had now admitted responsibility, but "what we have to assess, is it true he reformed or is he saying what is expedient." The witness responded by characterizing the applicant as "someone I kn[e]w from around," rather than someone he was socially familiar with, but that "he seemed to be very contrite about the situation, very remorseful about what happened to lead him to the problems that he had. And he never struck me as a person who lacked candor." The applicant's attorney elicited from the witness that in the relatively small world of the legal community where the applicant worked as a paralegal, the applicant "has a wonderful reputation" for honesty as well as for competence.

While this character testimony portrays a person liked and respected by others, it does little to help the applicant scale the height needed to make amends for his participation in the crime in which an elderly woman was killed, and it shows ordinary efforts rather than the extraordinary results for rehabilitation that was found in *Wiesner*.

Although the subcommittee, noting the passage of time and his contrition, recommended that the application be granted, the Committee voted to recommend disapproval by a vote of 16 to 12 (with one abstention). The Committee's November 22, 2011 majority report and recommendation found continuing factual inconsistencies and misstatements in the applicant's May 19th testimony summarized above concerning the reporting of his past crimes. The dissent faults the Committee for "improvidently" substituting its judgment for that of the subcommittee, but the Committee presumably had and reviewed the more recent transcripts and the record in its entirety and, in the final analysis, the Committee and not the subcommittee is vested with the responsibility for the final recommendation whether to admit or reject an applicant.

We, too, have the concern articulated by the Committee, and on that basis decline to grant the applicant's petition for admission to the bar of the State of New York. In so doing, we take into account the applicant's seemingly unblemished personal life since his release from incarceration as well as his commendable work ethic, but we remain troubled by either his inability or his unwillingness to retreat from what seems to be a continuing defensive posture in accounting for aspects of his criminal history. To be clear, we consider the fact of an earlier criminal history to be a factor but not a dispositive factor in our analysis, and we find no basis to suspect that the applicant will re-offend. To the contrary, his postrelease path has taken him to a seemingly stable, respectable, productive and law-abiding life which, one may hope, has proffered its own rewards. During that time he earned a law degree, married, helped to raise stepchildren, and often worked multiple jobs simultaneously. His employment included law-related work in which he undertook many tedious tasks, often at night, earlier in his career, and paralegal responsibilities for law firms throughout his later employment history. The record reflects a significant rehabilitation.

However, in our view, the application founders principally on two factors. While the killing of a victim during the commission of a felony is an extremely serious crime, the factual circumstances surrounding this case make this crime more egregious. Here, a helpless and defenseless 69-year-old woman awoken from sleep in the sanctity of her home, bound and gagged, most likely dying in extreme terror of an agonizing death as she was slowly asphyxiated while her home was ransacked and property stolen, weighs heavily against conferring on the applicant the privileged legal status that he now seeks. We find the tragedy of the outcome in the present case to require a more exacting accountability.

Secondly, in explaining that death as well as other aspects of his criminal record, the applicant also has displayed a pattern of shifting the blame away from himself. Even if recently he seemed more inclined to accept responsibility, he seemed to do so almost as a matter of formal rote, for criminal conduct that he had freely undertaken. That pattern was most visibly on display for the earlier phase of his application history, and we necessarily look more particularly at his more recent testimony. Yet, we still cannot avoid the observation that the applicant continues to evade a candid and complete acknowledgment of his responsibility for the events that comprise his criminal his-

tory. That equivocation diminishes the candor necessary to support this application.

While the dissent finds that the applicant shows remorse, there is ample testimony in which applicant attempts to shift blame and diminish his complicity in the crimes he committed. We find these factors are relevant and germane to our analysis of the applicant's present qualification.

In the twists and turns of the applicant's narratives over the years by which he sought to explain how he came to commit his various crimes, the extent of his participation and his perceptions of the aftereffects, the applicant has traveled neither a straight nor a smooth road, and the more recent testimony still leaves too much underbrush along the wayside. As previously stated, the fact of a victim's death raises the bar for rehabilitation and its counterpart, candor. Especially when the applicant's explanation of his limited role in the victim's death defy either the credible evidence or strain common sense, we cannot conclude that the self-created deficits in credibility that have consistency impeded the applicant in reaching his goal over the years have been rectified.

Moreover, if the fact of his crimes is not dispositive, nevertheless the analysis must account for the crimes. The burglary and the related death of the elderly woman are so serious that the applicant's burden was a high one from the beginning. The charge included felony murder. Although the applicant, avoiding trial, pleaded guilty to burglary, not murder, there is no serious doubt that a homicide occurred during the burglary in which the applicant participated. We are not required to ignore that. Nor are we required to ignore the applicant's equivocations over the years regarding his role and whether he should be held accountable for the woman's death. In view of the applicant's preexisting pattern of adjusting the story to fit what might seem to work, there is no compelling basis why we should accept at this juncture the present version of his supposed act of clemency wherein he stepped into the room to remove the gag, but the codefendant, once outside, returned to the house without any apparent reason and reinserted the gag. The applicant's explanation becomes more questionable when there was no testimonial evidence to show that codefendant even knew applicant had allegedly removed the gag from the victim's mouth. Although the applicant initially insisted that he had reported the event to his police contacts the following day, that excuse, which was persuasively contradicted by police testimony,

seems to have been abandoned in the most recent application. As to the applicant's attempt to distance himself from the burglary-homicide crime, we note that the stolen personal belongings of the victim were found in applicant's home and that he received substantial proceeds from sale of the stolen jewelry.

Also lost in the applicant's past speculation about the original subcommittee's motives, when the process was delayed due primarily to the deficiency in the applicant's application with missing and often misstated information, was the brutal result of the burglary—a helpless older woman was deprived of her life as she was slowly asphyxiated in her own home, as jewelry and other property of considerable value was stolen. Thus, it is not just the fact of the homicide, but the fact of how the applicant has addressed it. While only the most heartless person would lack remorse for that result, and we find no basis to doubt the sincerity of the applicant's regrets, he seemed to have lost sight of this in expressing his frustration, in connection with the pace of his earlier application. The applicant's continuing attempt in the present application to mitigate his responsibility for her death may be a humanly understandable attempt to distance himself emotionally from the inhumane result, but it continues to diminish his credibility.

Regarding the larceny charge, the applicant continued to stand by his prior testimony that he thought he was assisting the codefendant move merchandise and had no knowledge he was committing a crime when he was arrested unloading stolen merchandise from a hijacked truck. The applicant was subsequently charged with grand larceny, criminal possession of stolen property in the first degree, unauthorized use of a motor vehicle, and possession of burglar's tools. While the applicant continues to protest his lack of knowledge of the hijacked truck, it appears that applicant did plead guilty to the grand larceny and related counts together with the burglary-murder count.

With respect to the drug sales, here, too, the constantly improvisational nature over the years of how the applicant explained his putatively limited role understandably creates an impression of fabrication that spills over to the present. Most recently, he still described himself as a minor facilitator for "a person [who] approached me. I obtained an amount of drugs for them and I sold them. I was asked to get another amount. I purchased that amount and gave it to them. . . . my position is, I did those things. It was my decision to participate." Again, the

impression is that of a concession of culpability that is neither frank nor plausible, as though the applicant was doing a favor for the purchasers by assisting them to obtain cocaine rather than, as the record reflects, that he was a drug dealer who had sold substantial amount of drugs. Merely uttering words conveying an acknowledgment of responsibility does not automatically create credibility. Rather, the halting phrasing used by the applicant in his most recent testimony suggests circumlocution rather than a direct admission that would be consistent with the earlier police evidence that was, in the context of that proceeding, essentially informational. During the earlier hearing, the applicant was not being "tried," notwithstanding his complaint at that time that it was the equivalent of being convicted a second time if his petition was not granted; the officers were simply testifying to what they knew of the applicant's drug-related activities, and how confidential informants were handled as a matter of routine. The subcommittee was charged with the responsibility to inquire into these serious matters. The applicant had to square his present explanation with that evidence. However, as is apparent in his own testimony, the applicant again, danced around the issue rather than confronting it, even if he made an acknowledgment of guilt that by now he realized was necessary.

Notwithstanding the factors in the applicant's favor we find that the applicant has yet to demonstrate the character necessary for admission. Thus, we concur with the Committee's findings, adopt its recommendation and deny the renewed application for admission to the bar of the State of New York.

ANDRIAS, J. (dissenting). Almost 40 years ago, over a two year period, petitioner participated in crimes which led to his conviction on felony drug and burglary charges. Petitioner now seeks an order pursuant to Rules of the Appellate Division, First Department (22 NYCRR) § 602.1 granting his third application for admission to practice notwithstanding the adverse decision of the Committee on Character and Fitness (Committee). Although the subcommittee convened by the Committee to conduct a hearing as to petitioner's fitness unanimously recommended that the application be granted, the Committee, by a 16-to-12 vote, with one abstention, voted to disapprove the subcommittee's recommendation.

The majority acknowledges that petitioner, now 66, has led a stable, respectable, productive and law abiding life since he was released on parole more than 32 years ago, has expressed genu-

ine remorse for his crimes, is respected in the Brooklyn legal community where he works as a paralegal, and is not likely to re-offend. Two character witnesses, persons of achievement with significant professional credentials who placed their own reputations on the line by vouching for petitioner's integrity, attested to petitioner's sterling reputation for truth and honesty. Nevertheless, dwelling on petitioner's conduct with respect to his prior applications for admission, the last of which was filed more than 20 years ago, and straining to distinguish this matter from this Court's recent decision in *Matter of Wiesner* (94 AD3d 167 [1st Dept 2012]), the majority discards this evidence and finds that petitioner should once again be denied admission because, in the view of the majority, his post-conviction life has not been so exemplary as to make amends for his past crimes, for which petitioner continues to attempt to minimize his culpability.

I do not agree. Stripped of hyperbole and rhetoric, the majority is denying petitioner's application based on its belief that he has not been adequately punished for his past crimes, which include his participation in a burglary in which an elderly woman suffocated after she was gagged. However, that is not the test we applied in *Wiesner*, which focuses solely on whether the applicant *currently* possesses the character and fitness to practice law. Applying that test, although the nature and character of the crimes committed by petitioner raise serious concerns, petitioner's consistent behavioral pattern of responsibility and societal contributions over the past 32 years, and his admissions in his current application and before the subcommittee that he is responsible for his past criminal acts and for his lack of candor in his prior applications, clearly and convincingly demonstrate that petitioner's personal reform and rehabilitation are genuine and complete. Accordingly, because petitioner currently possesses the requisite character and fitness for admission to the bar, I dissent and would grant the application.

Between 1965 and 1967, petitioner attended Howard University. Between 1968 and 1970, he worked for the Post Office and the D.C. Transit Company. After attending Ohio State University for a year, between 1971 and September 1973 petitioner worked as a bus driver and then for an insurance company.

Petitioner's downward spiral into a life of crime occurred over the next two years, after the insurance company relocated and his employment ended. In November 1973, petitioner was ar-

rested and charged with forgery in the third degree and criminal simulation based on possession of counterfeit perfume. The charges were dismissed. Between 1973 and 1975, he was employed as a manager and assistant manager of massage parlors in New York and Rhode Island which served as fronts for a prostitution operation. In 1974, he allegedly interfered with a search at one of the parlors and was charged with obstructing a police officer. The charge was dismissed and all records related thereto sealed.

In March 1975, petitioner was indicted for multiple counts of sale of a controlled substance, but was released from custody so he could act as a confidential informant for the New York City Police Department's Organized Crime Control Bureau (the New York County case). A May 1, 1975 report states that petitioner was cooperating and maintaining his contacts with the police department "re[garding] large purchases of cocaine, organized crime figures involved in massage parlors and narcotics traffic." Petitioner, in his capacity as a confidential informant, was instrumental in the arrest of a cocaine dealer in December 1975 and testified at the dealer's trial in 1976.

In November 1975, petitioner was charged with grand larceny, criminal possession of stolen property in the first degree, and lesser charges. The indictment stemmed from his assisting his employer, on whom he claimed to be informing, by driving a truck to a location in Queens to unload hijacked merchandise. Petitioner maintained that he was unaware that the truck was stolen and that he thought he was, as he had in the past, helping his employer move merchandise for his furniture business.

On December 12, 1975, petitioner, still in his 20s, and his almost 60-year-old employer were arrested for burglarizing the Queens residence of a 69-year-old woman, whom his employer had targeted. During the course of the burglary, the woman was bound and gagged, which resulted in her death by asphyxiation. This led to petitioner's indictment for burglary and murder in the second degree (felony murder), which was consolidated with the indictment relating to the hijacked truck (the Queens County cases).

In May 1977, petitioner pleaded guilty to two counts of criminal sale of a controlled substance in the second degree in the New York County case and was sentenced to concurrent terms of 8⅓ to life. After evaluating petitioner's role in the 1975 burglary, the prosecutor allowed petitioner to plead guilty to burglary in the first degree in the Queens County cases and he was

sentenced to an indeterminate term, with a maximum of 20 years, to run concurrently with the sentence imposed in the New York County case.*

During his incarceration, petitioner earned a Bachelor of Science degree from New York State University/Regents College. Following his parole in December 1980, he worked at the Freewill Senior Citizen's Center until August 1982, when he left to attend Cardozo Law School. That year, petitioner married. He has three step daughters, one of whom he has legally adopted.

While in law school, petitioner completed a number of legal internships. He graduated in June 1985 and sat for the July 1985 bar exam. In December 1985, petitioner was notified that he had passed the exam and had been certified to the First Department.

In December 1985, petitioner submitted his first application for admission. On February 20, 1986, he received a final discharge from the parole board. On March 20, 1986, he was issued a certificate of good conduct from the Board of Parole "to remove all legal bars and disabilities to employment, license and privilege, except those imposed by Sections 265.01 (4) and 400 of the Penal Law [neither of which is related to the practice of law] and except the right to hold Public Office."

In December 1986, a subcommittee held a hearing on the adequacy of petitioner's disclosure of his criminal history. In its report dated April 27, 1987, the subcommittee found:

> "[b]ased upon the findings indicated by the various files and documents relating to [petitioner] examined by the Sub-Committee, it is our conclusion that [petitioner's] responses to Questions '17' and '18' (as amplified by the Supplementary Material submitted by him following his initial application) are incomplete, inaccurate and misleading, not only with respect to the number of arrests, the details of the various indictments against him, and the sentences imposed, but the circumstances surrounding each event. Moreover, our investigation reveals nothing to support his statement (made in response

---

* In connection with the Queens burglary, petitioner's codefendant was found guilty after trial of second degree murder. The Court of Appeals reversed the conviction and the case was remanded for a new trial based on a *Miranda* violation. The codefendant, almost 70 years old, was then allowed to plead guilty to robbery in the first degree.

to Question '17' of his December 1985 application) that the 'circumstances of [the December 1975] arrest were mitigating.' On the contrary, all of the records indicate that the arrest was to due to his serious involvement in the commission of a heinous crime, for his own gain, totally unrelated to his services as an informant for the Police Department."

The decision as to whether petitioner's rehabilitation, in all other respects, sufficiently merited his admission to the bar was referred to the Committee, which referred his application to a second subcommittee for a broader hearing as to whether he had been forthcoming regarding his criminal background and whether he possessed the requisite character and fitness to practice law.

In September 1989, petitioner withdrew his application. In June 1990, petitioner moved for leave to renew and to transfer his application to the Second Department. On March 1, 1991, this Court granted the renewal application but denied the request for a transfer. Thereafter, and continuing until August 1993, petitioner submitted additional documentation pursuant to the Committee's requests for updates and clarifications.

In November 1993, a subcommittee issued its report in which it recommended that petitioner be denied admission on the ground that he had failed to demonstrate the requisite character and fitness. The subcommittee specifically noted petitioner's lack of candor in his application, particularly with respect to his involvement in the December 1975 burglary, explaining:

"[i]t is the Sub-Committee's opinion that no useful purpose will be served by holding any further hearings or calling any additional witnesses. It is our conclusion that despite [petitioner's] apparent rehabilitation in many respects, throughout these proceedings he has deliberately made false and/or misleading affidavits and other statements under oath concerning his own conduct or the conduct of others which to his personal knowledge were untrue. After reviewing the record, including his testimony and supplemental affidavits submitted on his Renewed Application, it does not appear to us that he has yet overcome his compulsion to deviate from the truth, and even to fabricate, in his efforts to mislead this Committee in representations made by him in affidavits and sworn testimony; nor has he

overcome a pronounced tendency to excuse himself from fault by attempting to cast blame on others for his own misdeeds. Accordingly we conclude that [petitioner] has failed to demonstrate the character and fitness required to recommend him for admission to the Bar."

In January 1994, the Committee adopted the subcommittee's report and denied petitioner's second application. This Court denied petitioner's motion for an extension to petition for admission notwithstanding the Committee's decision. Petitioner then continued his rehabilitation, waiting 14 years before he moved to renew his previously denied application for admission.

On August 27, 2009, this Court granted petitioner's motion to the extent of referring the application to the Committee for "investigation, hearing and recommendation." On May 19 and June 7, 2011, a hearing on petitioner's third application was held before a new subcommittee. Petitioner testified on his own behalf and called two character witnesses. The first was a former New York State Supreme Court Justice. The second, an attorney admitted to practice for 34 years, was a past president of the Brooklyn Bar Association and New York City Trial Lawyers Association, a former Chair of the Second Department's Grievance Committee, and former member of the Second Department's Committee on Character and Fitness.

Petitioner testified that he has spent the last 30 years addressing the conduct that led to his crimes, during which time he continued his education and sought out positive influences. Upon his parole, petitioner worked as the Director of the Freewill Senior Citizen's Center in Brooklyn where he aided seniors with social security questions, home attendants, and other issues related to the elderly. While in law school, petitioner interned with the Legal Aid Society's Office of the Aging, performing legal research on issues involving the elderly. He also worked as a paralegal for an attorney doing research and writing on medical malpractice issues; as a legal intern with JC Penney's legal department drafting memoranda on corporate law issues; as an intern with Cardozo's Criminal Law Clinic; and as a student clerk for a now deceased Supreme Court Justice in New York County.

After law school, petitioner worked as a paralegal for a series of law firms. From 1993 until 2001, he worked as a paralegal for a former chair of the Brooklyn Bar Association, whose practice focused on elder law matters involving, inter alia,

Mental Hygiene Law article 81 and Surrogate Court proceedings. After this employer's death, petitioner became a self-employed paralegal doing per diem motion work for attorneys. In this capacity, petitioner is given a case file from an attorney, conducts the necessary legal research through his own Westlaw account, and drafts a motion, which he gives to the attorney of record for review and signature.

Petitioner attested that he chose elder law before, during, and after law school in an effort to atone for his role in the 1975 death of the 69-year-old Queens woman. He explained, "I assisted someone in going into a house and tieing [sic] up an elderly person who later died. I spent—I've spent 30 years trying to make up for that."

The former Supreme Court Justice testified that he came to know petitioner in 1992 as a result of his involvement with the Judicial Commission on Minorities, which had been formed due to concern over the high dropout rates among black males. He viewed petitioner as a perfect role model for dropouts since, after serving his prison sentence, he had become a productive member of society. The witness explained that "we don't have many stories like this story where we can go out and say, '[l]isten, it really happened. Here's a guy who got into trouble, went back to law school, turned his life around and now, look, he's a lawyer.' " However, petitioner was ultimately unable to serve as an official role model because of his inability to gain admission to the Bar. The witness also testified that even though petitioner has been denied admission over a 20-year period, he has impressed him with the manner in which he performed as a paralegal; that petitioner has not projected an attitude of self pity, nor complained about his circumstances; and that petitioner has an excellent reputation for truth, honesty, and candor.

The former chair of the Second Department's Grievance Committee testified that he met petitioner through one of petitioner's employers and had known him for 13 years. He was impressed that petitioner became involved in paralegal work after his incarceration and that he attended law school knowing the challenges that he would face. The witness was aware that petitioner had previously been denied admission due to his lack of candor in connection with his application. However, the witness testified that petitioner was very remorseful about his criminal past and, in the witness's opinion, had an excellent reputation for honesty and competence.

On August 23, 2011, the subcommittee issued its report in which it unanimously recommended petitioner's admission.

Observing that petitioner had acknowledged his past mistakes, including his lack of candor in the admissions process and his participation in the 1975 burglary, and that he was now contrite and remorseful and had attempted to atone, the subcommittee explained:

> "We have seriously considered the nature of [petitioner's] criminal convictions and the lack of candor that [petitioner] previously evinced before the Committee. While [petitioner's] prior actions reflect negatively on his qualifications for admission, there are mitigating factors that are evident from his submission. [Petitioner] acknowledges that he lacked candor in his previous application and is remorseful of his prior actions, including his participation in the 1975 burglary. [Petitioner's] criminal involvements occurred in the 70's, over 40 years ago when he was a young man. He also candidly admits his lack of candor in his prior request for admission to the Bar. He has a long uninterrupted work history since his release from prison. Notably, he enjoys a reputation for truthfulness and candor in the community and he has gained the respect of the community through his hard work. Significantly, it is apparent that [petitioner] who is now 64 years old, has already suffered substantially for his mistakes and has positively rehabilitated himself. He has paid his debt to society by serving his time in prison and overcoming his former criminal behavior. He is a productive and responsible member of society as testified to by his character witnesses. In sum, he currently possesses the character and fitness required to be a member of the New York State bar."

In narrowly disapproving the subcommittee's recommendation and denying petitioner admission, the Committee, in its report dated November 22, 2011, stated:

> "1. We are not persuaded by the Subcommittee Report and [petitioner's] testimony in the transcript of the hearing dated May 19, 2011, that [petitioner] is currently possessed of the proper and required traits of character and fitness that qualify him for admission to the New York State Bar and find his testimony not credible.
>
> "2. There remain questions and issues of fact involv-

ing inconsistencies and mis-statements included in the transcript of the hearing dated May 19, 2011, which call into question the truthfulness, accuracy and contrition of [petitioner] with respect to the reporting of past criminal events in which he was involved; and subsequently, his straightforward reporting of the same in both his Law School Application and his Application for Admission to the New York State Bar."

Judiciary Law § 90 (1) (a) directs, in relevant part, that upon certification that a person has passed the bar examination, the Appellate Division, upon being satisfied that "such person possesses the character and general fitness requisite for an attorney and counsellor-at-law . . . shall admit him to practice as such attorney and counsellor-at-law." A felony conviction does not, in and of itself, disqualify an applicant on character grounds (*see Matter of Newhall*, 143 AD2d 293 [3d Dept 1988] [admitting applicant who was convicted of assault in the second degree approximately nine years earlier]).

Consequently, "rather than taking the view that prior serious misconduct invariably requires disqualification, courts tend to consider the facts of each case in light of the totality of circumstances surrounding an application for bar admission" (*In re Manville*, 494 A2d 1289, 1295 [DC 1985]). We assess whether the record demonstrates that the applicant's "past problems are no longer manifest," whether the applicant has reformed and rehabilitated his or her life to the extent that "recurrence *is* unlikely," and whether the applicant no longer "possesses behavioral traits that may constitute a threat to individual clients or society in general and undermine the integrity of the legal system" (*Matter of Wiesner*, 94 AD3d at 172, 170). In performing this analysis,

> "we may be guided by the standards promulgated by the American Bar Association, which involve a number of related inquiries: the applicant's age when the crime was committed, whether the crime was recent, whether the information about the crime is reliable, the seriousness of the *conduct*, underlying factors, the cumulative consequences of the crime, evidence of the applicant's rehabilitation, whether the applicant has since made a contribution to society, the applicant's honesty during the application process and, in that regard, whether the

applicant omitted material information or made material misrepresentations (Comprehensive Guide to Bar Admissions Requirements, ABA Section of Legal Education and Admissions to the Bar and National Conference of Bar Examiners at vii-viii [1994-1995])." (*Wiesner* at 170-171.)

Viewed in the light of these principles, petitioner, as the subcommittee providently recommended, should be admitted to practice. Although petitioner engaged in very serious misconduct, that conduct occurred approximately 40 years ago when petitioner was in his 20s, and, with respect to the 1975 burglary conviction, under the influence of his almost 60-year-old employer, who had been arrested on two prior occasions that year for criminal possession of stolen property. Petitioner, now 66, has acknowledged that he was responsible for his past crimes and has, in the 32 plus years since his release from prison, undertaken a useful and constructive place in society. This includes raising a family, maintaining continuous and satisfactory employment as a paralegal, and devoting substantial time to the area of elder law in an effort to atone for the unintended death of the senior citizen during the 1975 burglary. Petitioner's character witnesses, who were made aware of his criminal history, his recovery and his present behavior, personally vouched for petitioner and attested to his present reputation for truth, honesty, and candor and his legal ability and good character.

Petitioner's admission is fully supported by this Court's recent decision in *Matter of Wiesner*. Unlike petitioner, who was at most a mid-level participant, Wiesner was the kingpin of an extensive criminal enterprise. From 1980 to 1982, Wiesner operated a large scale narcotics operation in which he used five sleep disorder clinics to direct clients to physicians, whom he paid up to $3,000 per day to write prescriptions for Quaaludes, then a schedule II controlled substance. The enterprise took in up to $20,000 per day at its peak, and Wiesner earned approximately $1 million in all. In December 1984, he was arrested, and in 1987 he pleaded guilty to conspiracy to violate federal narcotics laws and to distribution and possession of Quaaludes.

In 1985, Wiesner was convicted of attempted second-degree murder, first-degree burglary, first-degree unlawful imprisonment, second-degree criminal possession of a weapon, and first-degree criminal use of a firearm. The charges stemmed from an incident in which Wiesner cajoled his estranged girlfriend to

meet him at the Clifton train station by stating that they needed to exchange keys and other possessions. Once they met, he pointed a stolen handgun at her, threatened her, led her to a pier and forced her to go back to her apartment with him, where he held her against her will for over seven hours. Fearing for her life, Wiesner's former girlfriend escaped by jumping from a second-story window. As she fled, Wiesner fired five or six shots in her direction. While, fortuitously, none of the shots hit her, she sustained fractures in both her heels, tore cartilage in her chest, and injured the platebone in her back.

In 1989, Wiesner's petition for a writ of habeas corpus was granted on the ground that he was denied his right to represent himself at his attempted murder trial (*see Wiesner v Abrams,* 726 F Supp 912 [ED NY 1989], *affd* 909 F2d 1473 [2d Cir 1990]). When his former girlfriend, out of fear, would not cooperate with the District Attorney and return to New York to testify at the retrial, Wiesner was allowed to enter an *Alford-Serrano* plea (for which he did not have to allocute to the facts of his guilt) to attempted murder in the second degree in exchange for a sentence of 2 to 6 years, nunc pro tunc from December 1984, to run concurrently with time served for his federal drug conviction.

After his release from prison, Wiesner obtained a college degree, a law degree, passed the bar, and was admitted to practice in numerous jurisdictions. In his initial applications for admission to the New York bar, he alleged that he did not understand that his former girlfriend felt threatened when he held her in an apartment for several hours at gunpoint. He also asserted that when he fired the gun, he only wanted to scare her so that she would not alert the police, who would prevent his intended suicide, and that he had been misled by advice of counsel in connection with his narcotics operation. Even at his last hearing, Wiesner continued to dispute his mens rea in connection with the shots he fired at his ex-girlfriend and never explained why, if he was not preventing her from leaving the apartment, she felt it necessary to jump from a second-story window rather than leave through the door. Of great significance, he also expressed exasperation, if not resentment, at being asked to demonstrate his remorse over the incident.

Despite Wiesner's inability to acknowledge the extent of his culpability and adherence to explanations of his conduct that defied common sense, this Court found that while Wiesner's crimes were very serious, they were not recent, and that his

conduct over the last 30 years and the references of his character witnesses, persons of achievement with significant professional credentials, established that he had rehabilitated himself to such an extent that he satisfied the character and fitness requirement set forth in Judiciary Law § 90.

Although each application for admission must be judged individually, the same legal standards must be applied in all cases. Here, as in *Wiesner,* the record, including testimony by a former Supreme Court Justice and by a former Chair of the Second Department's Grievance Committee, clearly and convincingly establishes that petitioner's attitude and behavior subsequent to his criminal acts demonstrate personal reform and rehabilitation and that the traits that led to his criminal conduct have been excised from his character.

In an attempt to divert the analysis from the recent past to the very distant past, the majority devotes substantial time to an in depth analysis of why petitioner's first two applications were denied and finds that some of the traits bearing on petitioner's character with respect to the original applications still manifest themselves, "even if they seem less pronounced." The majority posits that petitioner takes responsibility in a "formal sense, but he clings to some explanations concerning the crimes he committed that continue to seem implausible." However, the twists and turns in the majority's writing are merely strained attempts to come up with some meaningful reasons to deny petitioner admission other that the fact that a woman died after she was gagged during the burglary, and are belied by the record relating to the application at issue, which demonstrates petitioner's acceptance of responsibility for his past crimes and for his lack of candor in his prior applications for admission.

In the petition before us, petitioner unequivocally states, among other things, that

> "I accept personal responsibility for my criminal conduct. My conduct was egregious and I am totally blameworthy for these acts and misdeeds. My prior application for admission to bar, upon reflection was not totally forthcoming. I wholeheartedly regret and apologize to the committee for not accepting responsibility for my actions.

> "I accept the finding of the subcommittee dated . . . November 15th, 1993, which was forwarded on

January 5th 1994, [and] concluded that my character and fitness were not such that I should be considered eligible for the bar."

As to his drug offenses, petitioner acknowledges that he obtained four ounces of cocaine for a person with whom he became friendly and that "[he] made the conscious decision to locate the drugs for him and on September 30, 1974, [he] delivered the drug to a pre arranged location." Petitioner also admits that he sold the same people four ounces of cocaine on October 4, 1974, delivered a sample to them on January 2, 1975, and was arrested on March 4, 1975 while delivering another eight ounces.

As to the hijacking, petitioner admits that on November 12, 1975, his employer asked him to drive his truck to Queens, where he was told to unload another truck that had broken down. As he was loading the truck, he was arrested.

As to the burglary charges, petitioner admits that he and another individual broke into a home where "we bound and gagged [an] elderly woman" and stole various articles, and that he was charged with felony murder and allowed to plead guilty to burglary after he admitted his involvement.

At the hearing before the subcommittee, petitioner addressed his lack of candor in his prior applications, stating that on his first application "I was not ready. I hadn't—I hadn't forgiven myself for what I had done. Since that first application, its been a steady process of self-reflection." Petitioner stated that he had now "come to the realization that I can sit before you and say yes, I did those things and yes, they were totally egregious and I don't know who that person was. It was me, but I don't know who that person was and I'm not that person now." Expanding on this point, petitioner explained:

> "The difference between myself now and then, is that I'm able to look at everything and categorically, without sugarcoating my presentation say to you that what I did then, and I am totally guilty of it, there is no explanation for it, there is no—I'm not trying to put blame on anyone else, other than myself, what I've done since then, is my own total examination of who I am as a person."

Petitioner stated that prior to this self-realization he had to justify what occurred in order to live with himself and that he "sought justification by blaming others, as opposed to saying to

myself, those are your acts, those are your decisions to do what you did. Even if—even if someone presented an opportunity, the final decision was still yours." He explained:

> "[A]t that point I wasn't ready to say that. I wasn't ready to accept responsibility. There was, in my head, a non-belief that that all happened to me. I didn't believe it. It was there in black and white obviously. I was in prison for five years. But in my head, I was still not ready to accept that that was me and I tried to justify the behavior."

When asked, "[s]o do you now admit that you knowingly and intentionally participated in the burglary that resulted in the death of that lady?", petitioner responded unequivocally: "Yes, I do." While petitioner adhered to his prior claim that after the burglary he returned to the apartment and removed the elderly woman's gag, he emphasized that "I don't want this to seem that I'm trying to lessen my own participation, that's not what I'm trying to do."

As to the drug charges, in the prior hearings petitioner made it appear that he was doing a favor for a friend in small drug deal and got caught. Petitioner now admitted that he sold "a substantial amount of drugs" on multiple occasions, that "I did those things. It was my decision to participate." He also admitted that he was responsible for the crimes and that there was no one else to blame for his actions.

The majority attempts to paint petitioner as a major drug dealer and experienced hijacker. However, each of petitioner's drug transactions involved the sale of approximately four to eight ounces, not kilos, and the majority attributes far too much significance to the police department's acceptance of petitioner as a confidential informant, which hardly establishes that he was an expert in hijacking.

Petitioner's candor was also attested to by his character witness, a former Chair of the Second Department's Grievance Committee. When asked if he had any insight on the critical question of whether petitioner had truly reformed or was just saying what is expedient, the witness explained:

> "One thing certainly that struck me was that he seemed to be very contrite about the situation, very remorseful about what happened to lead him to the problems that he had. And he never struck me as a person who lacked candor.

"And I guess the only other thing I could add to that is to say that between 1985 and 2011 is a long period of time. And I know, just from reviewing his application and talking to him a couple of times in contemplation of coming here today, that he is most remorseful about it. And I have never had an issue with him in my dealings with him about his lack of candor. . . .

"You know, I spent the whole time being in a place like Court Street, downtown Brooklyn. And one thing about us all is that, you know, we may be a relatively large group, but it's kind of a homogenous group. Everybody knows everybody, pretty much. And I would daresay that probably the best relationships I've had with lawyers are with people who I didn't have to worry about reducing it to writing, I could put my hand in their hand and go to the bank on it.

"So, I mean, to try to answer your question, . . . I mean, people like me, I think, know about people's reputation in our little community. And he has a wonderful reputation or I wouldn't be sitting here and I wouldn't have committed to doing this over 10 years ago. Because I did, like I said before, I told him that I would be happy to come here and to talk about him because I know of his reputation for honesty and I know of his reputation for competence as well."

The subcommittee found the testimony of petitioner and his character witnesses persuasive and concluded that petitioner "currently possesses the character and fitness required to be a member of the New York State bar." In discounting this testimony and finding that petitioner did not possess the proper and required traits of character and fitness that would qualify him for admission to the New York State bar, and that issues of fact remain as to petitioner's candor with respect to the reporting of the past criminal events in which he was involved, the Committee improvidently substituted its own credibility determinations for that of the subcommittee. Unlike the Committee, the subcommittee held a hearing at which it had an ample opportunity to observe the demeanor, evaluate the testimony and assess the credibility of each witness who testified, including petitioner, and rationally found that petitioner

was candid and sincere and had accepted responsibility for his crimes.

The majority compounds this mistake when it finds that petitioner's purported lack of candor concerning his past crimes outweighs the overwhelming evidence of his rehabilitation. As detailed above, petitioner explained at the hearing that he had not been ready to accept responsibility for his behavior in the past, and "sought justification by blaming others, as opposed to saying to [him]self, those are your acts, those are your decisions to do what you did." He then acknowledged that he intentionally participated in the 1975 burglary that resulted in the death of the Queens woman, that between 1974 and 1975 he intentionally participated in the sale of a substantial amount of illegal narcotics, and that he participated in the hijacking and did not want the subcommittee "to think that [he was] trying to lessen [his] own involvement." This testimony convincingly establishes that petitioner has now accepted personal responsibility for his past criminal conduct.

The majority's efforts to diminish the weight to be given to the testimony of petitioner's character witnesses is puzzling. While the majority asserts that the former Supreme Court Justice was not familiar with the details of petitioner's crime, this alleged deficiency existed in *Wiesner*, where many of the character witnesses lacked a full understanding of the nature and severity of Wiesner's crimes or blindly accepted Wiesner's incredible version of events.

Of note, the *Wiesner* majority observed that "[w]hile Dean Feerick was unfamiliar with the nature of petitioner's offenses . . . upon being so informed, [he] expounded on the importance of redemption in adhering to his recommendation that petitioner's application be approved" (*Wiesner* at 176). Here, a former New York State Supreme Court Justice, after being told of the death of the woman during the burglary, similarly expressed his view that "punishments—all punishments—must some day come to an end." When a subcommittee member advised the former Justice that petitioner took full responsibility for his actions in his current application and had explained why he was unable to do so in his earlier ones, the witness opined that petitioner's prior lack of candor was understandable and that he is now forthcoming, he should be admitted.

The majority also fails to give any weight to the fact that one of petitioner's character witnesses was a former Chair of the Second Department's Grievance Committee, and former

member of the Second Department's Committee on Character and Fitness. In contrast, in *Wiesner*, this Court noted that one of Wiesner's character witnesses "remarked that his own career had included a stint as an attorney for the Grievance Committee, making him especially sensitive to the embarrassing possibility that a recommended attorney might act dishonorably" (*Wiesner* at 177).

The majority places great weight on the fact that petitioner continues to adhere to his claim that he removed the gag from the woman during the 1975 burglary. However, a similar issue arose in *Wiesner*, where Wiesner incredibly maintained that he did not intend to hit his girlfriend when he repeatedly fired the gun out of a window through which she had just fled in fear for her life, after Wiesner kidnapped and held her at gunpoint for several hours. This Court essentially found that any unresolved issue as to Wiesner's actual intent and his unwillingness to retreat from a continuing defensive posture in accounting for aspects of his criminal history did not outweigh the substantial evidence of rehabilitation.

Significantly, the majority in *Wiesner* recognized that the dissent's "conclusion that petitioner has started the journey towards rehabilitation but is 'not there yet,' begs the question: how is [Wiesner] to get 'there' " (*Wiesner* at 184). Stating that "[w]e really cannot know" whether Wiesner was confused due to his drug intoxication at the time, or whether he "sincerely believes that the way he remembers the event is the truth," or whether it was in fact the truth, the majority criticized the dissent for taking the position that in order to be admitted Wiesner "must testify that he intended to kill his former girlfriend and shot at her, fortuitously missing, in furtherance of that intent" (*Wiesner* at 184).

Here too, the question remains that if petitioner, age 66, is not admitted now, then when. Although petitioner's testimony that he removed the gag during the 1975 burglary may be questioned, the subcommittee did not find the testimony to be a fabrication. Petitioner may sincerely believe that he did remove the gag. Yet the majority is in effect adopting the position that this Court criticized in *Wiesner*, holding that petitioner must testify that he never went back to remove the gag if he is ever to be admitted to the New York bar. This is not just. Our analysis of petitioner should be in accord with this Court's recent precedent for substantially analogous applicants and petitioner is entitled to the same treatment as Wiesner. Even if petitioner

may be deemed to have exhibited a defensive posture as to certain aspects of his crimes, he has acknowledged his responsibility for them, for which he spent five years in prison and over 30 years atoning. As the majority concedes, since his release on parole petitioner's "personal history took a commendable term for the better," and he has led a "seemingly unblemished personal life." Petitioner has demonstrated a "commendable work ethic," and there is "no basis to doubt the sincerity of [petitioners] regrets" over the elderly woman's death or to "suspect that [petitioner] will re-offend." Thus, contrary to the majority's ultimate finding, we are dealing with far more than the mere passage of time and "the extraordinary results for rehabilitation that was found in *Wiesner*" undeniably exist here.

Nevertheless, the majority would distinguish *Wiesner* on the ground that he was not admitted until his tenth application, whereas this is only petitioner's third. However, unlike Wiesner, who filed successive repetitious petitions and repeatedly sued unsuccessfully to challenge this Court's denial of his applications for admission (*see e.g. Wiesner v Rosenberger*, 1998 WL 695927, 1998 US Dist LEXIS 15666 [SD NY 1998], *affd* 1999 US App LEXIS 29259 [2d Cir 1999]; *Wiesner v Nardelli*, 2007 WL 211083, 2007 US Dist LEXIS 5801 [SD NY 2007], *affd* 307 Fed Appx 484 [2d Cir 2008]), petitioner patiently continued his rehabilitation without complaint for 14 years before applying for readmission after his second application for admission had been denied, and he should not be penalized for his exercise of restraint and good judgment.

Although the majority creates a new standard for admission and finds that petitioner has yet to adequately make amends for his crimes, it is clear that the only difference between petitioner and Wiesner is that Wiesner's victim survived the five or six shots he intentionally fired at her, whereas petitioner's victim suffocated after she was gagged during the 1975 burglary. While petitioner's victim, as the majority surmises, must have been terrified during the burglary, the victim in *Wiesner* was terrorized at gunpoint for seven hours, escaping only after she jumped out of a second story-window in fear of her life.

The significance of the fact that a 69-year-old woman died during the burglary cannot be understated, and imposes a heavy burden on petitioner. However, that death, while tragic, does not in and of itself warrant the denial of petitioner's application. After the prosecutor assessed petitioner's role in the crime, he was allowed to plead guilty to burglary, not murder, and it

has never been alleged that he or his codefendant intended to harm the woman when she was gagged (*see In re Manville*, 538 A2d 1128 [DC 1998 en banc] [admitting applicant who was convicted 15 years earlier of a homicide that he committed in the course of a burglary in which a victim died from an unusual reaction to the chloroform that Manville applied]; *Matter of James G.*, 296 Md 310, 462 A2d 1198 [1983] [admitting an applicant who 16 years earlier committed conspiracy to commit forgery, forgery and uttering, murder, and assault]). Nor does petitioner's drug conviction operate to disqualify him (*see Wiesner* at 170-171; *Matter of Kesselman*, 100 AD2d 606 [2d Dept 1984] [advance ruling that the applicant's prior conviction of criminal sale of a controlled substance in the third degree would not operate to disqualify him on character grounds]; *Matter of Sobin*, 649 A2d 589, 589 [DC 1994] [admitting applicant "despite (his) felony convictions for conspiracy to manufacture a controlled substance and aiding and abetting both interstate prostitution and interstate transportation in aid of interstate racketeering" approximately seven years earlier]).

Contrary to the majority's view, I do not cite *Wiesner* to compel a particular result in the present, different case. Again, my position is that the legal standards with reference to an application for admission that this Court employed in *Wiesner* must be applied equally to petitioner. Thus, the import of the references to the facts in *Wiesner* is to demonstrate that the majority's attempts to show that petitioner does not satisfy those legal standards is disingenuous, and boils down to their belief that petitioner should not be admitted because the victim of the 1975 burglary died, whether intentionally or not. However, a per se rule of exclusion, even when the applicant's past offenses are grave ones, conflicts with the principle that "the test is whether the applicant currently possesses the character and fitness to practice law" (*Wiesner* at 172), as well as "[t]he concept that human redemption is possible and valuable—a belief that is both well established in law and premised upon long-standing, even ancient traditions" (*In re Dortch*, 860 A2d 346, 356 [DC 2004] [internal quotation marks omitted]). As the former Justice who testified on petitioner's behalf eloquently stated, "punishments—all punishments—must some day come to an end." Here, petitioner has lived an exemplary life for more than 30 years since his release from prison and has shown that he is fully rehabilitated and currently possesses the requisite character and fitness for admission to the bar. Nothing

further can be accomplished, other than as an inappropriate punitive measure, by denying his application for admission, which poses no threat to the public.

Accordingly, we should issue an order granting petitioner's application for admission to practice as an attorney and counselor-at-law in the State of New York notwithstanding the Committee's decision.

FRIEDMAN and SWEENY, JJ., concur with TOM, J.P.; ANDRIAS and FREEDMAN, JJ., dissent in an opinion by ANDRIAS, J.

Petition denied.